UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IRMA J. DURDEN, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:07-cv-865 |
| MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, | § § § § § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiff's Motion for Relief from Judgment and Plaintiff's Motion for Attorneys Fees. For the following reasons, both Motions, Doc. No. 38 and Doc. No. 28, are **GRANTED**. The following clarification of the Court's January 2008 Order shall be provided to the Administrative Law Judge on remand. Plaintiff will be awarded full attorneys' fees.

I.  BACKGROUND

This case has a long and somewhat unorthodox procedural history. Plaintiff's application for disability benefits was denied initially and on reconsideration. After a hearing, in June 2004, the Administrative Law Judge (ALJ) found that Ms. Durden did not meet the criteria for a Listing, but held that she became disabled due to a back injury on June 10, 2003. Plaintiff appealed this decision to the Appeals Council, and the Council reversed the ALJ's decision and remanded for a new hearing. The Appeals Council's decision appeared less favorable to Plaintiff than the ALJ's original decision. The ALJ conducted a de novo hearing and issued a second partially favorable decision in October 2007. In the second decision, however, the ALJ found that Ms. Durden's disability did not commence until December 2, 2003, six months later than the onset date the ALJ

1

found in his original decision. The Appeals Council upheld the ALJ's findings, and Ms. Durden appealed the decision to this Court.

In January 2008, the Court held that the ALJ's decision regarding Ms. Durden's onset date was not supported by substantial evidence and that the ALJ's determination was at odds with the requirements of the relevant regulations. The Court also found, however, that the ALJ did not err in finding that Ms. Durden did not meet the requirements of Listing 12.05. The Court did not reach other arguments raised by Ms. Durden, but did advise the ALJ of the need to perform the Psychiatric Review Technique set forth in 20 C.F.R. §404.1520 on remand.

Plaintiff then filed a Motion for Attorneys' Fees, and this Court granted Plaintiff's motion in part. The Court then granted Plaintiff's request to file further briefing explaining why she was entitled to an award of full attorneys' fees.

When considering Plaintiff's additional briefing on attorneys' fees, the Court reviewed its January 2008 Order, and found that it had likely made an error regarding Plaintiff's Listing argument. The Court held a hearing at which it discussed its concerns with the parties and asked the parties to file an update as to the status of the case on remand. The Court also invited Plaintiff to file a short Motion for Reconsideration under Federal Rule of Civil Procedure 60.

The Parties have since filed their respective status reports. Plaintiff claims that pursuant to the Court's remand, a hearing was scheduled for May 21, 2008. Plaintiff states that Ms. Durden and her attorney were present at the May hearing, but the hearing was postponed due to a defective Notice of Hearing. Plaintiff further explains that the ALJ took no testimony at the May 21 hearing and has not reset the hearing or issued a decision. Defendant agrees that a hearing was set for May 21, but states only that the record was held open for additional evidence. Defendant also states that the ALJ determined that a pulmonary consultative examination was needed, and was requested on

July 21, 2008. According to Defendant, it usually takes approximately 90 days for such an exam to be conducted and for the ALJ to receive the report. The report is then provided to Plaintiff's attorney, who has 15 days to submit comments. Although the Parties' respective accounts vary slightly, the upshot is that the ALJ has not yet ruled on Ms. Durden's application on remand. The Court finds, therefore, that it is appropriate to correct its previous Order, pursuant to Federal Rule of Civil Procedure 60, and provide the ALJ further instructions on remand.[1] *See also Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n. 1 (5th Cir. 2004).

## II. ANALYSIS

In its January 2008 Order, the Court found that the ALJ applied the correct legal standard in assessing whether Ms. Durden met Listing 12.05 and that the ALJ's finding that Ms. Durden did not meet the listing was supported by substantial evidence. The Court now determines that there were errors in the ALJ's assessment of Listing 12.05 and that the ALJ should reconsider Ms. Durden's Listing argument in accordance with this Order on remand.[2]

### A. Listing 12.05[3]

The Court reiterates its prior finding that a claimant must meet both the description of mental retardation set forth in the introductory paragraph as well as one of the severity requirements in order to meet or equal Listing 12.05.

The introductory paragraph to Listing 12.05 states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports

---

[1] The Court recognizes that in doing so, adjudication of Plaintiff's claim may once again be delayed. This is an unsatisfactory outcome, particularly given that Plaintiff filed her initial application for benefits over seven years ago. Nonetheless, counsel for Plaintiff has invited the Court to do so, and the Court therefore presumes that further clarification is in Plaintiff's best interests.
[2] The Court does not alter its prior holding with regard to the ALJ's determination of the onset date of Plaintiff's physical disability.
[3] The Court set forth the relevant legal standard for evaluation of the ALJ's decision in its prior Order.

3

onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05. The diagnostic description for mental retardation therefore requires that a claimant demonstrate both subaverage general intellectual functioning and deficits in adaptive functioning. *Id.* A claimant who satisfies the diagnostic description must also demonstrate that she meets the "required level of severity," which includes:

> B. A valid verbal, performance, or full scale IQ of 59 or less; or
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

*Id.*

### 1.   *Significantly Subaverage General Intellectual Functioning*

Ms. Durden's scores on the WAIS-II I.Q. Test were: Full Scale I.Q.—59, Verbal I.Q.—61, and Performance I.Q.—65. (Rec. 169.) Neither Dr. Mark Lehman, who conducted the IQ testing, nor the ALJ questioned the accuracy of the scores. The ALJ did express concern that no psychological testing had been performed prior to age 22. Dr. Lehman provided a sworn statement, however, stating that "it is reasonable to assume her IQ has remained stable since 1973-74." (Rec. 225.) Dr. Lehman additionally noted that "in the absence of brain trauma, I.Q. is stable throughout life." (*Id.*) Dr. Lehman's comments are consistent with a substantial body of case law finding that a claimant need not present results of I.Q. testing conducted prior to age 22. *See, e.g., Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001) (finding that there is a presumption "that IQ's remain fairly constant throughout life"); *Muncy v. Apfel*, 247 F. 3d. 728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning); *Guzman v. Bowen*, 801 F.2d 273, 276-75 (7th Cir. 1986) (adopting presumption that low I.Q. existed prior to first I.Q. test); *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) ("[T]here may be many reasons why an individual would not have had

4

the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation."); *Rowell v. Apfel*, 2000 WL 1449887, at *5 n.3 (E.D. La. 2000) (refusing to decide the question, but citing a series of district and circuit court opinions finding that a low I.Q. score raises the presumption of manifestation during the developmental period). Although the Fifth Circuit has not directly ruled on this question, it has considered whether a defendant was mentally retarded in other contexts, relying on I.Q. testing that took place after the defendant reached the relevant age. *See, e.g., Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir. 2005) (considering I.Q. scores obtained after the defendant was 18 years old when analyzing whether the defendant had manifested significantly subaverage intellectual functioning prior to the age of 18).

The Court finds this caselaw persuasive. Thus, Ms. Durden's I.Q. scores obtained in 2004 presumptively establish her I.Q. prior to the age of 22. Because there is no evidence in the record suggesting that Ms. Durden's I.Q. has changed, Ms. Durden has established as a matter of law that she had "significantly subaverage general intellectual functioning" that manifested in the developmental period. *See, e.g.,* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41, 49 (4th ed., Text Revision, 2000) ("DSM-IV") (defining significantly subaverage general intellectual functioning as "an I.Q. of approximately 70 or below on an individually administered I.Q. test"). To the extent that the ALJ's decision that Ms. Durden did not meet Listing 12.05 was based, in part, on a finding that Ms. Durden did not demonstrate significantly subaverage general intellectual functioning due to the absence of "any intelligence testing prior to January 2004," (Rec. 19), the ALJ applied an incorrect legal standard.

    2.    *Deficits in Adaptive Functioning*

In order to meet Listing 12.05, Ms. Durden was also required to demonstrate that she had deficits in adaptive functioning initially manifested in the developmental period.

### a. Definition

Listing 12.05 itself does not explicitly define "deficits in adaptive functioning." The Social Security Administration (SSA) has stated that the definition of mental retardation in the introductory paragraph of the Listing is "consistent with, if not identical to, the definitions of mental retardation used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002). The SSA recognized that the four major professional organizations in the United States that deal with mental retardation have "each established their own definition of MR," and noted that "[w]hile all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* For example, the American Psychiatric Association's DSM-IV notes that the essential feature of mental retardation is significantly subaverage general intellectual functioning "that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years" *Id.* (citing DSM-IV and noting that the definition is predominantly based on the revised definition promulgated by the American Association on Mental Retardation). The DSM-IV's diagnostic criteria further clarifies that a diagnosis of mental retardation requires "[c]oncurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meting the standards expected for his or her age by his or her cultural group) . . . .") DIAGNOSTIC AND STATISTICAL

MANUAL OF MENTAL DISORDERS 45 (4th ed., Text Revision, 2000) ("DSM-IV"). The American Psychological Association's definition, on the other hand, requires "significant limitations in adaptive functioning, which exist concurrently" with an onset before the age of 22 years; the "criterion of significance is a summary index score that is two or more standard deviations below the mean." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (citing MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN MENTAL RETARDATION (Am. Psych. Ass'n. 1996)). After reviewing the professional organizations' definitions of mental retardation, the SSA declined to adopt any one of the specific definitions, explaining:

> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

*Id.* Thus, the introductory paragraph of Listing 12.05 can be met if the individual is found to have, *inter alia*, deficits in adaptive functioning as defined by any of the four professional organizations.

Although the SSA has not explicitly defined "deficits in adaptive functioning," Listing 12.00 does provide criteria for assessing the "severity" required by section (C) of some other mental impairments and by section (D) of Listing 12.05. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (C). These criteria include "adaptive activities of daily living," (such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."), "social functioning" (including "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers") and "concentration, persistence, or pace" (defined as "the ability to sustain focused attention and concentration sufficiently long to permit the

7

timely and appropriate completion of tasks commonly found in work settings."). *Id.* at § 12.00(C)(1)-(3). Although it is not clear that the SSA intended these criteria to be synonymous with the term "deficits in adaptive functioning," some courts have considered these criteria when determining whether a claimant has the deficits in adaptive functioning required to meet Listing 12.05(C) because they overlap, to some extent, with the examples of adaptive functioning behaviors provided in the DSM-IV.[4]

There are several adaptive behavioral instruments that can be used to assess an individual's adaptive functioning. *See, e.g.*, RICHARD M. GARGIULO, SPECIAL EDUCATION IN CONTEMPORARY SOCIETY: AN INTRODUCTION TO EXCEPTIONALITY 152 (2d ed. 2005); MENTAL RETARDATION: DETERMINING ELIGIBILITY FOR SOCIAL SECURITY BENEFITS 166 (Board on Behavioral, Cognitive, and Sensory Sciences and Education 2002) (noting that "[t]here are at least 200 published adaptive behavior instruments" and that three are in wide use for diagnosis, and adding that "[a]lthough each scale described has both strengths and weaknesses, each has impressive psychometric characteristics and is highly recommended for use in eligibility determination and diagnosis."). Reliance on information from family, peers, and friends in making such an assessment is also appropriate. See MENTAL RETARDATION: DETERMINING ELIGIBILITY FOR SOCIAL SECURITY BENEFITS 235 ("Judgments about intellectual and adaptive functioning should be based on multiple sources of information including, at a minimum, the individual client and significant others such as (depending on age) parents, teachers, peers, neighbors, and family members."); SSR 85-16, Residual Functional Capacity for Mental Impairments (Nov. 30, 1984).

### b. Analysis

---

[4] The severity criteria do not consider, however, factors such as functional academic skills, which are considered adaptive functioning criteria by the DSM-IV.

In its January 2008 Order, the Court found that the ALJ had properly determined that Ms. Durden did not meet Listing 12.05 because there was substantial evidence that she did not have deficits in adaptive functioning as required by the Listing's introductory paragraph. After a careful review of the record and the relevant legal standard, the Court finds it necessary to modify that conclusion.

The Court reviewed the relevant evidence of Ms. Durden's adaptive functioning behaviors in its prior Order and incorporates those findings in full. (Doc. No. 24, 7-11.) Critically, the record included a diagnosis by Dr. Mark Lehman, a psychologist, finding that Ms. Durden has mild mental retardation. (Rec. 169.) The ALJ himself found that Ms. Durden's severe impairments include "Mild Mental Retardation." (Rec. 19.) Dr. Lehman's diagnosis of mild mental retardation clearly means that Dr. Lehman found that Ms. Durden had deficits in adaptive functioning, as this is an essential component of any officially recognized definition of mental retardation. Dr. Lehman reached that conclusion, not only based on Ms. Durden's IQ scores, but also after reviewing "extensive medical records" and background information provided by Ms. Durden's brother, and after conducting an interview with Ms. Durden herself.[5]

It is not clear why the ALJ found, first, that Ms. Durden had mild mental retardation at Step 2, but then held that she did not meet Listing 12.05 at Step Three. The ALJ's decision does not appear to be based on a finding that Ms. Durden did not meet the severity criteria set forth in 12.06(B) or 12.05(C); indeed, the ALJ did not even discuss these criteria.[6] Instead, as explained in

---

[5] There is no indication that Dr. Lehman utilized any of the adaptive functioning tests.

[6] Ms. Durden would appear to meet the severity criteria of either 12.05(B), which simply requires an IQ score of 59 or lower, or 12.05(C), which requires an I.Q. score of 60 through 70 and a "physical or other mental impairment imposing an additional and significant work-related limitation of function." The SSA has clarified that "[W]here more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided, in the Weschler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(D)(6)(c). Ms. Durden's lowest score was her full scale score of 59, which appears to meet the severity criteria in 12.05(B), and the ALJ did not reject Ms. Durden's IQ score. The ALJ never discussed Listing 12.05(B) in his decision or in his questioning of the ME. It also seems quite possible that Ms. Durden's additional physical impairments

9

the Court's January 2008 Order, the ALJ seems to have found that Ms. Durden did not meet the Listing because she failed to show the deficits in adaptive functioning required by the introductory paragraph of Listing 12.05. These two positions are clearly inconsistent. When finding that Ms. Durden has mild mental retardation, the ALJ found at Step 2 that she did, in fact, have deficits in adaptive functioning, because such deficits are an essential part of the definition of mental retardation, regardless of whether it is considered "mild."

Furthermore, the ALJ's approach to assessing Plaintiff's adaptive functioning appears misguided. The ALJ relied on a medical expert's testimony that Plaintiff's adaptive functioning was "fairly adequate" and on Plaintiff's past unskilled work to find that Plaintiff did not have deficits in adaptive functioning.

When evaluating the ALJ's finding, the Court finds it helpful to consider the DSM-IV definition of Mild Mental Retardation, which includes individuals with an I.Q. level of between 50-55 and approximately 70:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV, 42-43. The Court bears in mind that people diagnosed with Mild Mental Retardation, by definition, have been found to have significant deficits in adaptive functioning. DSM-IV, 41.

---

imposed a significant work-related limitation, though the ALJ again failed to discuss this matter. *See, e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00 ("[W]e will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)).

Additionally, there is no indication, at least from the definitions of adaptive functioning deficits of which this Court is aware, that adequate functioning in certain areas can somehow make up for deficits in other areas.

The ME's testimony that Ms. Durden appeared to have "fairly adequate adaptive functioning" does not clearly contradict Dr. Lehman's finding that Ms. Durden has Mild Mental Retardation. Medical expert Dr. Daryl Knox first testified that Ms. Durden appeared to meet Listing 12.05(C). The ALJ pushed Dr. Knox on this point, leading him to backtrack a bit and state that "it seems like [Ms. Durden's] adaptive functioning, her ability to work and to perform her ADLs were fairly adequate despite her IQ . . . ." (Rec. 254.) The ALJ appears to have been guided in his questioning of Dr. Knox by the December 2004 Appeals Council decision, which stated that the evidence in the record did not support any significant deficits in adaptive functioning. (Rec. 193.) The Appeals Council noted that Plaintiff allegedly admitted she is not illiterate and that she did not attend special education classes. *(Id.)* The Council also pointed out that Plaintiff's poor performance in Seventh Grade may have been due to excessive absences. *(Id.)*

Given that individuals with Mild Mental Retardation may acquire academic skills up to a sixth-grade level, the fact that Plaintiff is not completely illiterate does not necessarily render Dr. Lehman's assessment incorrect. In this case, Dr. Lehman found that Ms. Durden could read at a First Grade level and to spell and do arithmetic and spelling at a Kindergarten level. (Rec. 169.) Another doctor stated that Ms. Durden said she could "read and write short sentences" and subtract and perform addition of single digit numbers," which does not contradict Dr. Lehman's findings. (Rec. 21.) Dr. Lehman also explained that Ms. Durden:

> [M]ade one omission error when counting to ten and several omission errors reciting the alphabet. She could spell her last name forwards but could not spell her last name in reverse. . . . Ms. Durden did not know how many quarters are in a dollar, how many nickels are in a quarter or how many dimes are in a dollar.

11

(Rec. 168.) Notably, Dr. Lehman found that Ms. Durden had "put forth an adequate effort," and in no way indicated that Ms. Durden was malingering. (Rec. 168.) Dr. Lehman also added that Ms. Durden was unable to complete certain personality testing due to her "illiteracy." (Rec. 170.) Thus, even if Plaintiff is not completely illiterate, this evidence alone suggests that she had deficits in the area of functional academic skills.

As the Court noted in its January 2008 Order, the record also reflects Ms. Durden failed second grade (Rec. 244), was put into special education (Rec. 243, 290), and left school after receiving all D's and F's in the Seventh Grade (Rec. 226, 243).[7] The Appeals Council pointed out that Plaintiff in an initial application checked a box stating that she was not in special education. Plaintiff did not fill out this form for herself, and when asked about the form at the second hearing, Plaintiff told the ALJ that she did not understand his question and did not fill out any forms. There appears to be nothing else in the record that clearly contradicts the assertion that Plaintiff was in special education.[8] Furthermore, while Ms. Durden's Seventh Grade record may have been influenced by her early marriage and multiple absences, it is just as plausible that Ms. Durden, frustrated with school due to poor performance and academic difficulties, chose to marry young and to avoid school. While factual determinations are usually for the ALJ, the Court notes that the ALJ failed to discuss any of this evidence or to explain why he did not credit Dr. Lehman's assessment, if that was, indeed, the case.

The ALJ also may have placed undue emphasis on Plaintiff's past work experience. The ALJ took into account "evidence which shows that the claimant did indeed perform unskilled work subsequent to obtaining age 22" when finding that Ms. Durden failed to show deficits in adaptive

---

[7] The administrative record only includes school records from the seventh grade. The Court notes, however, that obtaining such records from over thirty years ago can be difficult.
[8] Indeed, if Plaintiff did not receive special education services in elementary school despite such poor reading, spelling, and arithmetic skills, she likely should have.

12

functioning. (Rec. 19.) A person can meet the diagnostic description of mild mental retardation even though she has worked in the past. *See, e.g.*, CAROLYN A. KUBITSCHEK, SOCIAL SECURITY DISABILITY: LAW AND PROCEDURE IN FEDERAL COURT § 5:44 (1994) ("[T]he fact that a claimant has previously worked does not refute the conclusion the claimant is mentally retarded."). Moreover, just because a person may demonstrate an ability to perform unskilled work does not mean that they do not have deficits in adaptive functioning. Indeed, the DSM-IV definition of Mild Mental Retardation makes clear that persons with mild mental retardation, "usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress." DSM-IV, 43.[9] Moreover, an individual with Mild Mental Retardation may manage to hold an unskilled job despite her intellectual limitations, but when faced with an additional physical impairment, be unable to work, as recognized by Listing 12.05(C). *See, e.g., King v. Barnhart*, 2007 WL 968746, at *4, *6 (S.D. Ind. Feb. 26, 2007) (finding that plaintiff met Listing 12.05(C) and noting that when plaintiff "had been in better physical shape at a younger age, he had managed to hold a number of different jobs . . . despite his intellectual limitations," but that "when [plaintiff] also had to cope with significant physical impairments, it became much more difficult for him to work."). The ALJ's reference to Ms. Durden's work *subsequent* to age 22 is also confusing, given the Listing's focus on deficits in adaptive functioning manifesting *prior to* age 22. Finally, if a claimant meets a Listing, the ALJ's inquiry must stop, and no further evaluation of the claimant's ability to work is needed. *Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666, 669 (4th Cir. 1989) ("[T]he Secretary may

---

[9] Ms. Durden has only held two jobs, both of which were obtained with the help of her husband. The record reflects that Ms. Durden had significant difficulties working in a halfway house beginning at age 17, and required extra supervision and guidance in her work as a housekeeper at a motel, at least during the early stages of that job, which could constitute a time of unusual social stress. Ms. Durden has only held two jobs,. The Court discussed this testimony in its prior Order. (Doc. 24, 7-8.) These difficulties are consistent with Dr. Lehman's finding that Plaintiff had deficits in adaptive functioning.

not rely upon previous work history to prove non-disability where the section 12.05(C) criteria are met: 'When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.'"(citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir.1987)). Thus, Ms. Durden's history of performing unskilled work after age 22 does not by itself refute Dr. Lehman's finding that Ms. Durden had deficits in adaptive functioning or his diagnosis of Mild Mental Retardation.[10]

Finally, the ALJ and the Appeals Council seem to have disregarded entirely the testimony that Ms. Durden has never lived alone (and probably would not be able to do so), does not go shopping alone, and is unable to read and pay utility bills. (Rec. 269.) Nor do the ALJ or Appeals Council discuss Dr. Lehman's conclusion that Plaintiff is not able to manage a benefit check in her own behalf. (Rec. 170.) The opinion entirely disregards the testimony that Ms. Durden had no friends outside of her family growing up "because they all called me names . . . like stupid . . . .", (Rec. 291), and that, as an adult, Ms. Durden had only a few friends outside the family, (Rec. 304, 124 (medical report noting that Plaintiff "has no friends or hobby").[11] The ALJ did note that Ms Durden "fed her dogs, cleaned the yard, gardened, drove for short distances and performed household chores such as cooking, vacuuming, and washing dishes" in assessing Plaintiff's residual functional capacity, (Rec. 21), but failed to mention these tasks in his analysis of Listing 12.05.[12]

---

[10] Defendant points to other cases in which courts have considered a claimant's work experience in finding that she does not have deficits in adaptive functioning, but those cases involve far more extensive work than Plaintiff in this case performed or other evidence that suggested a lack of deficits in adaptive functioning. *See, e.g., Humphries v. Barnhart*, 183 Fed. Appx. 887, 889 (11th Cir. 2006) (unpublished); *Higgins v. Barnhart* 288 F.Supp.2d 811, 818-19 (S.D. Tex. 2002) (noting, *inter alia*, that plaintiff had completed two years of college, had an eighth grade reading level (and could be expected to perform better than her test results reflected), read avidly and worked as a housekeeper for many years). Nor did any of these cases involve a plaintiff with an actual diagnosis of mild mental retardation.

[11] Nor did the ALJ discuss Dr. Lehman's finding that Ms. Durden had a current Global Assessment Functioning (GAF) score of 40, which the DSM-IV describes as "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV, 34. *See also King*, 2007 WL 968746 at *4 (taking into account plaintiff's GAF score of 59 when evaluating deficits in adaptive functioning) (citing DSM-1V at 34).

[12] Furthermore, there is some confusion regarding whether Ms. Durden can or cannot drive. (*See* Rec. 291 (testimony that Ms. Durden never learned to drive.))

While some of these tasks would tend to support a finding that Plaintiff does not have deficits in certain areas of adaptive functioning, they do not necessarily negate a finding of such deficits in other areas.

The ALJ did recite the findings in Dr. Lehman's Medical Source Statement. In the statement, Dr. Lehman indicated that Ms. Durden had "extreme"[13] restrictions in understanding and remembering detailed instructions and carrying out detailed instructions, "marked"[14] limitations in understanding and remembering short, simple instructions, carrying out short, simple instructions and the ability to make judgments on simple work-related decisions. (Rec. 21.) Dr. Lehman also concluded that Ms. Durden had a "moderate"[15] restriction in her ability to interact appropriately with the public, supervisors, and co-workers, and a "marked" limitation in responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting. (Rec. 172.) The ALJ did not question or even discuss these findings when finding that the evidence failed to demonstrate that Ms. Durden had adaptive functioning deficits prior to age 22.

The Court notes that if the ALJ in this case was unsure about Dr. Lehman's conclusions, it could have issued interrogatories to Dr. Lehman or even asked for Dr. Lehman or another expert to perform adaptive functioning testing. An ALJ has a duty "to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Newton v. Apfel*, 209 F.3d 448, 457 (5th Cir. 2000) (noting also that where a record is incomplete, the ALJ may not make medical determinations). The ALJ is, of course, entitled to rely on a Medical Expert's testimony, but in this case, Dr. Knox appeared ready to agree with Dr. Lehman until prompted otherwise by the ALJ.

---

[13] The statement defines extreme: "There is a major limitation in this area. There is no useful ability to function in this area." (Rec. 171.)
[14] The statement defines marked: "There is serious limitation in this area. The ability to function is severely limited but not precluded." (Rec. 171.)
[15] The statement defines moderate as: "There is moderate limitation in this area but the individual is still able to function satisfactorily." (Rec. 171.)

15

Furthermore, Dr. Knox's limited and ambiguous testimony that Ms. Durden's adaptive functioning seemed "fairly adequate" was not sufficient to refute Dr. Lehman's finding—based on a comprehensive psychological examination—that Ms. Durden had the deficits in adaptive functioning required for a diagnosis of Mild Mental Retardation .

Plaintiff also urged this Court in prior briefing to find that the ALJ erred by not complying with the requirements of 20 C.F.R. §404.1520 which sets forth a special technique for evaluating the severity of mental impairments in adults.  The Court recognized in its January 2008 Order that the ALJ had failed to comply with the regulation, and would be required to do so on remand, but failed to reach the question of whether this failure was prejudicial.  Although Plaintiff's argument regarding the psychiatric review technique was with regard to other alleged psychiatric conditions, the Court notes that the psychiatric review technique would also require the ALJ to make specific findings with regard to Listing 12.05.  The Court now finds that performance of the Psychiatric Review Technique may well have helped orient the ALJ with regard to the Listing 12.05 requirements, and that his failure to comply with the regulation was therefore prejudicial.  *See Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988); *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000).

In reviewing a decision by an ALJ, this Court may not re-weigh the evidence or substitute its judgment for that of the ALJ.  *See, e.g., Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).  The Court must ensure, however, that the "proper legal standards were used in evaluating the evidence." *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Neither the ALJ nor this Court may improvise its own definition or standard for "deficits in adaptive functioning." *Barnes v. Barnhart*, No. 02-5153, 2004 WL 2681465, at *8 (10th Cir. Nov. 26, 2004) (unpublished) (criticizing the ALJ for "essentially improvis[ing] his own definition for 'deficits in adaptive functioning'"). Furthermore, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's

decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated . . . ."). As a general principle of administrative law, "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery*, 332 U.S. 194, 196-97 (1947). Although the Court initially found in its January 2008 Order that it was possible to discern the reasons for the ALJ's Listing determination, further review of the record and briefs leaves the Court uncertain as to the ALJ's basis for his Listings determination.

The Court is confused by the ALJ's contradictory finding that the Plaintiff has mild mental retardation but does not have the necessary deficits in adaptive functioning. The Court also finds the ALJ's decision regarding Listing 12.05 difficult to review given the ALJ's failure to provide clear reasons for rejecting Dr. Lehman's diagnosis of mild mental retardation and because of the ALJ's failure to explain the standard by which he was evaluating Plaintiff's "deficits in adaptive functioning." Articulation of this standard is particularly important, because the record does appear to reflect that Ms. Durden did at least have some deficits in adaptive functioning. The Court also finds that, under the circumstances, the failure to conduct the Psychiatric Review Technique, was prejudicial.

The Court recognizes that the ALJ is already reviewing this case on remand to determine the correct onset date of Plaintiff's physical disability. The Court is also cognizant that the ALJ generally "is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly." *See, e.g., Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). The Court will therefore simply modify its January 2008 Order, and ask the ALJ on

remand to additionally reconsider its determination that Ms. Durden did not meet either Listing 12.05(B) or 12.05(C). In accordance with this Order, the ALJ should explain the standard by which it is assessing Ms. Durden's deficits in adaptive functioning, clarify its specific reasons for rejecting Ms. Durden's claim and, if necessary, obtain further evidence or evaluations necessary to evaluate Ms. Durden's adaptive functioning.

## IV. ATTORNEYS' FEES

The Court finds that the Government's position in this case was not substantially justified, and that Plaintiff's Motion for Attorneys' Fees should be granted in full in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). The Court vacates its earlier Order, Doc. No. 33. Plaintiff should file a final affidavit regarding fees with the Court no later than September 15, 2008.

## V. CONCLUSION

Plaintiff's Motion for Relief from Judgment, Doc. No. 38, and Motion for Attorneys Fees, Doc. No. 28, are **GRANTED.** This case is remanded to the ALJ with further instructions on remand. Plaintiff will recover full fees under the EAJA.

**IT IS SO ORDERED.**

**SIGNED** this _8_ day of September, 2008.

_____
KEITH R. ELLISON
UNITED STATES DISTRICT JUDGE